# Illinois Official Reports

## Appellate Court

---

**In re Commitment of Rendon*, 2014 IL App (1st) 123090**

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF ENRIQUE RENDON, a Sexually Violent Person (The People of the State of Illinois, Petitioner-Appellee, v. Enrique Rendon, Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-12-3090 |
| Filed<br>Rehearing denied | November 26, 2014<br>December 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's revocation of respondent's conditional release from his commitment under the Sexually Violent Persons Commitment Act on the ground that the State presented clear and convincing evidence that respondent's release would jeopardize the "safety of others" was against the manifest weight of the evidence, notwithstanding respondent's initial lack of compliance with the treatment protocol and deviant fantasies that posed a threat to the public, since that threat diminished with the initiation of the Eligard drug treatment and his "sexual behavior" had improved; however, due to the trial court's misapprehension that respondent had not violated any conditions of his release, the cause was remanded for further factual findings with respect to the evidence presented at the revocation hearing and to allow the State to amend its petition, file a new petition, if warranted, and to make an appropriate decision. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 98-CR-80004; the Hon. Michael B. McHale, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Daniel T. Coyne, Matthew M. Daniels, and Michael R. Johnson, all of Law Offices of Chicago-Kent College of Law, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Erica Seyburn, Assistant Attorneys General, of counsel), for the People.

Panel

JUSTICE LAVIN delivered the judgment of the court, with opinion. Justices Fitzgerald Smith and Epstein concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent Enrique Rendon was civilly committed as a "sexually violent person" under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 *et seq*. (West 2010)) and subsequently institutionalized in a secure facility. The trial court later conditionally released respondent only to thereafter revoke the release on the State's petition, concluding that the "safety of others," a standard identified in the statute (725 ILCS 207/40(b)(4) (West 2010)), required such revocation. On appeal from the revocation order, respondent contends this undefined statutory standard is unconstitutionally vague. He alternatively contends the State failed to prove by clear and convincing evidence that his conditional release should be revoked. Finally, he contends the trial court improperly relied on his clinical psychologist's reexamination report at the revocation hearing, thus requiring reversal.

¶ 2    We issued our initial opinion on August 21, 2014. Both parties subsequently filed petitions for rehearing. Having reviewed the petitions and responses filed by the parties, we now grant respondent's petition for rehearing, which necessarily requires modification of our opinion, and deny the State's petition for rehearing upon modification of the opinion. We reverse the judgment of the circuit court revoking respondent's conditional release.

¶ 3                                    BACKGROUND

¶ 4    Respondent, now age 66, has been civilly committed to the control, care, and treatment of the Department of Human Services (DHS) since 2002, when he admitted the allegations in the State's petition and the trial court accordingly found he was a sexually violent person (SVP) diagnosed with pedophilia (sexually attracted to minor females), substance abuse problems, and later, paraphilia not otherwise specified (sexually attracted to nonconsenting females), frotteurism, and antisocial personality disorder. See 725 ILCS 207/5(f) (West 2010). Respondent's underlying offenses included a 1989 guilty plea conviction and 16.5-year sentence for aggravated criminal sexual assault, aggravated criminal sexual abuse, aggravated kidnaping, and kidnaping, which was imposed after respondent kidnaped and assaulted an eight-year-old girl. Respondent served six years and was released on parole. In 1997, respondent violated his parole by repeatedly attempting to lure children into his vehicle and

- 2 -

also refused sex offender treatment. It was thereafter that the State sought to have respondent civilly committed under the then newly effective SVP law.

¶ 5    Following his adjudication as an SVP, respondent was institutionalized in a secure facility under the Act. After psychological treatment and polygraph examinations, respondent *self-reported* having committed some 25 sexual offenses against females between the ages of 4 and 40. In one instance, respondent admitted climbing into bed next to his daughter's 17-year-old intoxicated girlfriend. Respondent's daughter found him naked from the waist down, and the victim's pants were pulled down. Although respondent was arrested following this offense, charges for the sexual offense apparently were never filed. Respondent also admitted repeatedly raping his own wife. He claimed to have participated in various grooming and stalking behaviors of young girls that culminated with rape or other sexual assaults. In addition, he said he raped two prostitutes after supplying them with drugs and alcohol, then threatened their pimp and had them "working for him" over the next several years, during which time he sexually assaulted them. Respondent used physical force and weapons to coerce sexual compliance. He also admitted to committing some 20,000 frottage offenses where he targeted young women and rubbed against them for sexual gratification. His psychological evaluation revealed a consistent pattern of deception by respondent.

¶ 6    Two years after being formally adjudicated an SVP, respondent filed a petition to be conditionally released for reintegration into the community. Respondent was "reexamined" a number of times to determine whether he remained an SVP, *i.e.*, was dangerous because he suffered from a mental disorder making it "substantially probable" that he would engage in acts of sexual violence. See 725 ILCS 207/5(f) (West 2002). According to the reports, reexamination consisted of reviewing his progress in treatment, psychological testing, clinical interviews, and risk analysis. In May 2010, Dr. Edward Smith, a licensed clinical psychologist, filed one such report noting respondent's sexual offense and DHS treatment history. Dr. Smith stated that respondent was participating in treatment, making progress, and had completed a relapse prevention plan, whereby he was to use techniques to manage and interrupt deviant sexual arousal. Respondent's most recent penile plethysmorgraph (PPG) test had indicated no deviant sexual arousal, and respondent demonstrated understanding of his cycle and plan. That, together with his decreased risk of reoffense based on respondent's advanced age, led Dr. Smith to recommend that respondent be reintegrated into the community on a "highly structured" conditional release program. Dr. Smith stated that respondent had demonstrated sufficient progress to lower his risk so that he could be safely managed in the community.

¶ 7    On the heels of this report and following a hearing, the court granted respondent conditional release on June 30, 2010, and he was released into the community on September 14, 2010. As per the statute, the court-approved "conditional release plan" was a detailed agreement between DHS and respondent severely limiting respondent's freedom and movement based on his status as an SVP. Relevant for this appeal, respondent was placed on home confinement. He was also ordered to refrain from contact with minor children absent DHS approval, and to refrain from entering into sexually intimate relationships unless he first gave notification to his conditional release agent. His plan required that respondent participate in sex offender treatment, behavioral monitoring, PPG testing and polygraph examinations. Respondent was to meet regularly with his conditional release agent to discuss "compliance with the conditions of his release and treatment progress" and also comply with other special conditions identified by his conditional release agent and case management team to restrict

respondent from "high-risk situations" with "access to potential victims." Tracking the language of the statute, the plan provided that respondent's conditional release would be revoked if he "failed to abide by any condition of his release plan" or if "the safety of others" required revocation, at the recommendation of the conditional release agent. See 725 ILCS 207/40(b)(4) (West 2010). Respondent signed and initialed a certificate indicating that he understood the plan and that his conditional release would be revoked if he failed to abide by the stated conditions.

¶ 8        Respondent was on conditional release for less than a year before the State filed a revocation petition on July 5, 2011. This petition was based on admissions during a polygraph examination taken May 30, 2011, that respondent had masturbated to fantasies of rape more than 20 times while released, a fact which he failed to disclose to his treatment providers until faced with the polygraph. The State also alleged that respondent failed the polygraph examination in that deception was noted when he denied rubbing against anyone for sexual gratification, denied masturbating to fantasies of rape, and denied masturbating to phone sex. The State asserted respondent's deception threatened the safety of others and required revocation of his conditional release. A hearing followed in August. Respondent acknowledged in open court that he had not told his therapist about these fantasies and only disclosed them before his polygraph exam. While the court denied the State's petition, it specifically warned that any further incidents would justify revoking respondent's conditional release.

¶ 9        In October 2011, apparently in response to respondent's difficulty controlling deviant arousal, he was prescribed Eligard, a prescription medication thought to lessen sexual urges by lowering testosterone levels. A number of court status hearings also followed with the State representing that respondent had either failed or deliberately distorted the results of his polygraph exams and that he was not working with his treatment providers.

¶ 10        In June 2012, the State again filed a petition to revoke respondent's conditional release. In making its allegations, the State relied principally on the June 6, 2012, reexamination report filed by clinical psychologist Dr. Smith, which the State attached and incorporated into its petition. The State alleged respondent was having "significant difficulty managing his deviant sexual arousal" and had been "less than forthright with his case management team." In support, the State cited respondent's deviant sexual fantasies "prior to the initiation of Eligard" and respondent's denial of "masturbating to the deviant sexual arousal since the initiation of Eligard." In addition, the State noted respondent's failed polygraph examinations, his intentional interference with the examinations, and his admission that he contemplated having females in his apartment without his conditional release agent's knowledge. The State noted Dr. Smith's opinion that respondent's "lack of disclosure and the presence of secret keeping" suggested defendant's word could not be taken "at face value." Given respondent's "high risk behaviors" and lack of insight into the level of risk, the State urged the trial court to revoke respondent's conditional release to protect "the safety of others" in the community. The State noted that under the Act, conditional release may be revoked on that basis or if respondent violated any condition or rule of conditional release.

¶ 11        An evidentiary hearing was held June 29, 2012. The court noted that the statute was disjunctive; the State had to prove by clear and convincing evidence that a rule or condition was violated *or* that the safety of others required revocation of conditional release. Licensed clinical social worker Rhonda Meacham testified that she was on respondent's case

management team and had been treating him since fall 2010. She met with respondent weekly for 90-minute group therapy sessions and had seen him individually for 60-minute sessions since February 2012. In addition, the State noted Meacham's semiannual report, dated October 2011 to March 2012. Meacham testified that respondent's primary issues were managing his deviant sexual arousal and being transparent in therapy so he could pass his polygraph examinations.

¶ 12    Between June 2011 and February 2012, respondent had been unreliable in self-reporting. Meacham testified he had failed his May 2011 polygraph examination and, in particular, apparently failed the question of whether he had "rubbed up against anybody." In September 2011, respondent's PPG test revealed no indication of arousal, but respondent also "engaged in behaviors that could have manipulated the outcome" which could invalidate the test and at the very least showed he was not following instructions. In November 2011, he was said to have distorted the polygraph results by shaking his legs during the test. In February 2012, respondent's polygraph examination was inconclusive on two questions, one regarding whether he masturbated to fantasies of rape, and he failed the question of whether or not he had women in his apartment. Meacham noted that up until February 2012, respondent continued to struggle with "fantasies of force" and would masturbate to thoughts of both force and frottage. Respondent reported he could continue to masturbate to deviant fantasies without increasing his risk of reoffending even though his reevaluation report indicated these types of fantasies preceded sexually violent acts by respondent. On cross-examination, Meacham stated she did not know what might negatively impact the PPG test results. She also stated when a person failed one question on a polygraph test, some examiners considered the entire exam to be failed, while some did not.

¶ 13    Nonetheless, Meacham also testified that based on respondent's recent polygraph examination from June 25 (the Monday before the hearing), it appeared he had "become more honest since February of 2012 to date." Meacham explained that cognitive therapy–like snapping a rubber band on his wrist when faced with a deviant thought–had previously proved ineffective for controlling respondent's arousal, so in October 2011, respondent was treated with the drug Eligard, which decreases testosterone levels and helps manage sexual arousal. On cross-examination, she stated she did not know how frequently respondent received the Eligard injections or how many he had received. She also stated that some clients reported immediate responses to the medicine, while it took others some six months to respond. In addition, Meacham believed respondent's fantasies of using force had decreased but she could not determine whether the Eligard had affected respondent's general sexist attitude toward women, *i.e.*, whether a cognitive shift had occurred. She testified that based on respondent's self-report, "there was a pretty sharp decrease in the amount [*sic*] of fantasies that he was having" and he was not masturbating at all. She testified that while he had made progress, she did not believe it was the same progress "he claims to have made." She also believed "there was a shift taking place" at the time he took the February 2012 polygraph while medicated with Eligard. Notably, respondent's failure to disclose information relating to his masturbation had occurred *prior* to the Eligard treatment. After the February 2012 polygraph, respondent made more disclosures regarding his issues than before. For example, in response to his February 2012 exam, respondent denied ever having a female in his apartment but reported that he "had a lot of urges to have women in the apartment," which may have contributed to him failing the test. Respondent specifically noted there was a female near his building one evening and, while

he had strong urges to invite her to his apartment, he never did. On cross-examination, Meacham stated that in the last year, respondent's "sexual behavior" had improved. She stated that since June 2012, respondent was "moving in the right direction" and had been more transparent.

¶ 14 Dr. Smith testified next that he had expertise in evaluating sexually violent persons, specifically as to risk assessment and diagnosis. As part of his employment with DHS, Dr. Smith had completed five annual reviews of respondent, with the last in June 2012, to determine whether respondent's current placement was appropriate to meet his treatment needs. For the evaluation, Dr. Smith conducted a clinical interview with respondent, reviewed his case management and treatment notes for the year, and consulted with both Glazier, respondent's conditional release agent, and Meacham, his treatment provider. Dr. Smith opined that respondent remained an SVP, as defined under the Act, having been diagnosed with pedophilia (sexually attracted to minor females), paraphilia not otherwise specified (sexually attracted to nonconsenting females), frotteurism, substance abuse, and antisocial personality disorder. Respondent still suffered from these mental disorders, which predisposed respondent to engage in future acts of sexual violence, and it was still substantially probable, or much more likely than not, that respondent would reoffend. The actuarial instruments placed respondent in the category of low to "moderate high" range for risk of reoffending, with additional risk factors including antisocial personality disorder, early-onset sex offending, and self-regulation problems.

¶ 15 Dr. Smith testified that even though respondent consistently attended treatment, given his behavior for the 2011-12 evaluation period, respondent could not be safely managed in the community. Dr. Smith cited respondent's failed polygraph examinations, admissions of dishonesty to his treatment team, and lack of insight that having or masturbating to deviant sexual fantasies was high-risk behavior. The fact that respondent had passed his most recent polygraph test did not change Dr. Smith's opinion because respondent acknowledged over the course of his review period that he had not been forthcoming with his treatment team about his level of deviant sexual arousal and masturbation to deviant fantasies, or accepted the risk this posed. Dr. Smith noted respondent had admitted that even before leaving on conditional release, he had been masturbating to deviant sexual fantasies without telling his treatment providers and "he had previously not been as honest and open as he would have led people to believe." Respondent also admitted that he had not used intervention methods to interrupt his deviant sexual arousal and "had thoughts about planning" to have women in his apartment without anyone knowing. Dr. Smith noted, many times respondent's disclosures only came after a failed polygraph and asserted respondent was not being forthright in his disclosures. Dr. Smith testified that respondent's Eligard treatments did not change his opinion that respondent could not be safely managed and should no longer be on conditional release because while Eligard was a tool for controlling arousal, it did not necessarily "eliminate it," and could not be used to control respondent's thoughts or cause him to "intervene" when aroused. Dr. Smith similarly did not know how often respondent received the Eligard treatments.

¶ 16 Dr. Smith testified that sexual offending could be conceptualized as a cycle with a number of different steps, and certain behaviors or emotions could lead a person "closer to the point of offending." For respondent, his secret-keeping, deviant arousal, masturbation to deviant fantasies, and failure to take responsibility even while in a restricted environment, were steps

in the sexual offense cycle moving him "closer and closer" to "high-risk behaviors being evident." Dr. Smith testified respondent would be better managed in a secure facility because respondent's access to individuals who "could be the source of either his thoughts, his fantasies, or his planning behaviors" and potential victims would be limited. On cross-examination, Dr. Smith acknowledged that respondent self-reported that his sexual fantasies had significantly decreased following his Eligard treatments.

¶ 17    In closing, the State argued that the evidence indicated respondent had not followed the conditions of release because he was uncooperative during psychological testing, but then chose to argue the case almost exclusively on the alternative "safety of others" prong.

¶ 18    Following argument, the trial court granted the State's petition to revoke conditional release. Although the court specifically found the State had *not* shown by clear and convincing evidence that a specific rule in the conditional release agreement had been violated, the court nonetheless found the "safety of others" required respondent's reconfinement. In support, the court pointed to issues that were related to perceived shortcomings in complying with the conditions imposed on respondent's release. This included Meacham's testimony regarding respondent's unreliable self-reporting, his failed polygraph examinations, his failure to follow instructions on the PPG test and the limited effect of Eligard on his deviant sexual thoughts. The court also pointed to Dr. Smith's testimony that respondent could not be safely managed in the community because of respondent's admitted failure to be forthright with his case management team and lack of insight regarding the risk his sexually deviant fantasies posed. The court noted Dr. Smith's testimony that respondent had disregarded treatment intervention methods and specifically had thoughts about "how to get females into his apartment without anyone on the case management team knowing about it." The court stated, "[t]he key is that these secrets have only come to light after he has been caught on polygraph examinations," and further noted Dr. Smith's testimony that these behaviors are part of the cycle of sexual offending, with "each step" moving "the person closer and closer to re-offending." The court stated that because respondent was not "moving forward in his treatment" and was "continuing to be deceptive with his case management team," it was appropriate to revoke his conditional release.

¶ 19    On June 29, 2012, the trial court revoked respondent's conditional release, and he was reinstitutionalized at a DHS facility. Respondent filed a motion to reconsider the judgment, which was denied, and this timely appeal followed.

¶ 20                                                ANALYSIS

¶ 21    Respondent now challenges the revocation of his conditional release.[1] An understanding of the law of conditional release under the Act is necessary before dissecting the parties'

---

[1]The parties have not addressed whether subsequent events could have rendered this issue moot, since respondent can file yet another petition to be conditionally released (see 725 ILCS 207/60(a) (West 2010)). Even if that were true, we believe this case would fall under an exception to the mootness doctrine. See, *e.g.*, *In re Lance H.*, 2014 IL 114899, ¶ 13 (discussing the public interest exception, which applies where public officers need authoritative guidance on a public question that will likely recur; *In re Gloria B.*, 333 Ill. App. 3d 903, 904-05 (2002) (discussing the exception of capable of evading review, where the action must be of a short duration so that it cannot be fully litigated and respondent must be subject to the complained of action again).

particular arguments. The Act defines an SVP as a person who has been convicted of a sexually violent offense and who is "dangerous" because he "suffers from a mental disorder that makes it *substantially probable* that the person will engage in acts of sexual violence." (Emphasis added.) 725 ILCS 207/5(f) (West 2010); *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 48; see also *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶¶ 31, 37 (defining substantially probable as "much more likely than not" (internal quotation marks omitted)). Under the Act, a mental disorder is a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2010); *Stanbridge*, 2012 IL 112337, ¶ 48. Although the proceedings set forth in the Act are civil in nature (725 ILCS 207/20 (West 2010)), the State still must establish beyond a reasonable doubt that an individual is an SVP; once the State does so, the respondent is committed to the custody of DHS for control, care, and treatment "until such time as the person is no longer a sexually violent person," which could hypothetically only end upon death. 725 ILCS 207/35, 40(a) (West 2010); *Stanbridge*, 2012 IL 112337, ¶¶ 48, 50.

¶ 22        In this case, respondent was found to be an SVP and was accordingly institutionalized in a secure setting where he received treatment for his mental disorders. See 725 ILCS 207/50 (West 2010). Consistent with the Act, respondent was thereafter "reexamined" yearly to determine whether he qualified for conditional release. See 725 ILCS 207/55 (West 2010); *Stanbridge*, 2012 IL 112337, ¶ 49. The relevant statute specifically provided that these reexaminations were "for the purpose of determining whether the person has made sufficient progress to be conditionally released or discharged." 725 ILCS 207/55(a) (West 2010).

¶ 23        After eight years of institutionalization, and after finding respondent had made sufficient progress in treatment, the court granted respondent conditional release on the recommendation of Dr. Smith, presumably pursuant to section 60 of the Act (see 725 ILCS 207/60 (West 2010)). Section 60 identifies the requirements underlying a petition for conditional release from commitment in a facility. Section 60(c) specifically provides that after a petition for conditional release is filed, the trial court or respondent may request a psychological examination, and a probable cause hearing follows on the evaluators' reports. 725 ILCS 207/60(c) (West 2010). At the relevant time in this case, section 60(c) stated that a full hearing was to take place on a conditional release petition if, at the probable cause hearing, the trial court had reason to believe "it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release." 725 ILCS 207/60(c) (West 2010). Section 60(d), which addresses the full hearing, provided that the trial court was to consider all the reports of the examiners filed with the court and to "grant the petition unless the State proves by clear and convincing evidence that the person has not made sufficient progress to be conditionally released." 725 ILCS 207/60(d) (West 2010). Reading section 60(c) together with section 60(d), as well as section 55(a), the Act authorized a court to conditionally release a committed respondent only if he had made sufficient progress in treatment such that he was not substantially probable to commit sexually violent acts while on conditional release. *Cf.* 725 ILCS 207/5 (West 2010) (under the definitions, a " 'Sexually violent person' means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence"); see also *People v. Cooper*, 132 Ill. 2d 347, 354-55 (1989) (same under the Sexually Dangerous Persons Act);

*People v. Trainor*, 196 Ill. 2d 318, 336-38 (2001) (noting the similarities between the Act and the Sexually Dangerous Persons Act).

¶ 24 Later statutory amendments confirm this interpretation of the Act's plain language. See *In re Application of Skidmore*, 2011 IL App (2d) 100730, ¶ 28 (" 'A subsequent amendment to a statute may be an appropriate source for discerning legislative intent.' " (quoting *In re Detention of Lieberman*, 201 Ill. 2d 300, 320-21 (2002))); see also *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 976 (2006) (noting in reference to section 60(d) of the Act (725 ILCS 207/60(d) (West 2002)) that "[o]f course, what a person is 'making sufficient progress' in is treatment"). Effective on August 24, 2012, before final judgment was entered in this case, the legislature amended the statutes cited immediately above, adding that reexaminations are for the purpose of determining whether "(1) the person has made sufficient progress in treatment to be conditionally released and (2) whether the person's condition has so changed since the most recent periodic reexamination *** that he or she is no longer a sexually violent person." 725 ILCS 207/55(a) (West 2012); Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/55(a) (West 2010)); *cf.* 725 ILCS 207/65(b)(2) (West 2012) (discharge statute, mirroring language under point two).[2] Likewise, the legislature amended section 60(c), so that a full hearing on the petition for conditional release is required if there is "cause to believe the person has made sufficient progress in treatment to the point where he or she is no longer substantially probable to engage in acts of sexual violence if on conditional release." 725 ILCS 207/60(c) (West 2012); Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/60(c) (West 2010)). Section 60(d) was also amended to state: "The court shall grant the petition unless the State proves by clear and convincing evidence that the person has not made sufficient progress in treatment to the point where he or she is no longer substantially probable to engage in acts of sexual violence if on conditional release." 725 ILCS 207/60(d) (West 2012); Pub. Act 97-1075 (eff. Aug. 24, 2012) (amending 725 ILCS 207/60(d) (West 2010)); *cf.* 725 ILCS 207/5(f) (West 2012) (defining sexually violent person the same as in 2010 statute). Indeed, considering the evils sought to be remedied by the law, it would make little sense to release an individual into the public even while under supervision if he were substantially probable to commit the very offenses for which he was originally committed. See *Lieberman*, 201 Ill. 2d at 312.

¶ 25 In simpler terms, to be conditionally released, an SVP must reach a certain point in treatment so that he can be safely managed in the community while still in the custody and control of DHS and while subject to the conditions set by the court and rules of DHS. See 725 ILCS 207/40(b)(4), (b)(5) (West 2010); see also *Cooper*, 132 Ill. 2d at 355 (noting, a sexually dangerous person maintains that legal status while on conditional release); see also *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) (noting that revocation deprives a respondent not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on respondent's observance of conditional release restrictions). In relevant part, these conditions require a respondent to attend and fully participate in assessment, treatment, and behavior monitoring, including, but not limited to, medical, psychological or psychiatric

---

[2]If a respondent is not substantially probable to commit a sex offense on conditional release, then it is hard to say he meets the definition of an SVP, requiring that element. The State points out the obvious confusion the statutes create, as the standard for determining discharge is also that the respondent is no longer a sexually violent person (although seemingly in a larger sense).

treatment specific to sex offending or drug abuse to the extent appropriate and based on subsequent DHS recommendations. 725 ILCS 207/40(b)(5)(F) (West 2010). These conditions also require a respondent to waive any confidentiality so that the court and DHS have access to his assessment and treatment results. 725 ILCS 207/40(b)(5)(G) (West 2010). While on conditional release, a respondent must comply with all other special conditions that DHS may impose restricting him from "high-risk situations" and limiting "access or potential victims." 725 ILCS 207/40(b)(5)(BB) (West 2010). "If the Department [(DHS)] alleges that a released person has violated any condition or rule, or that the safety of others requires that conditional release be revoked, he *** may be taken into custody under the rules of the Department [(DHS)]." 725 ILCS 207/40(b)(4) (West 2010). The State maintains the burden of proving with clear and convincing evidence that revocation of conditional release is required. *Id.*

¶ 26    In this case, less than a year after respondent had been conditionally released, the State alleged respondent was essentially unable to manage his deviant sexual arousal, lacked insight into his high-risk behaviors, and had failed his psychological exams. Consistent with the statute, the State asserted these behaviors threatened the "safety of others" requiring revocation of respondent's conditional release.

¶ 27    On appeal before this court, respondent argues that the statutory standard "safety of others" is unconstitutionally vague because the legislature failed to define the phrase and, consequently, the statute fails to give fair warning to individuals regarding its application, resulting in arbitrary enforcement. Because we choose to dispose of this case on the basis of respondent's alternative argument relating to the quantum of evidence adduced at the hearing, we need not address respondent's claim of constitutional error, which he has raised for the first time on appeal. Our supreme court has emphatically stated time and again that a reviewing court should avoid constitutional questions where the case may be decided on other grounds. *In re Detention of Swope*, 213 Ill. 2d 210, 218 (2004); see also *In re E.H.*, 224 Ill. 2d 172, 178 (2006).

¶ 28    Respondent then alternatively contends the State failed to prove by clear and convincing evidence that the "safety of others" required the court to revoke respondent's conditional release. Respondent specifically argues the State presented evidence showing only "mere concerns about [respondent's] progress in sex offender treatment" and showing that he failed to disclose deviant sexual fantasies. Respondent asserts this evidence falls manifestly short of threatening the "safety of others," which is a standard that must "mean more than simply the risk associated with allowing a sexually violent person to remain on conditional release."

¶ 29    The State, in interpreting the meaning of the phrase "safety of others," argues revocation is required under that provision where there is "concern that an SVP is heading towards committing acts of sexual violence." In other words, a respondent need not commit an overt act of sexual violence in order to come within the purview of the phrase.

¶ 30    As respondent correctly observes, the phrase "safety of others" is not specifically defined in the Act. In the absence of a statutory definition, courts will assume that statutory words have their ordinary and popularly understood meanings. *People v. Bailey*, 167 Ill. 2d 210, 229 (1995). Webster's dictionary defines "safe" to mean "free from harm or risk" and "secure from threat of danger, harm, or loss." Merriam-Webster's Collegiate Dictionary, http://www.merriam-webster.com/dictionary/safe. We will construe this term in the context of the Act as a whole, while considering the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved. See *Stanbridge*, 2012 IL 112337, ¶ 70. In doing so, we wish to

- 10 -

emphasize that under the Act it is the respondent's mental disorder, which necessarily encompasses a volitional impairment, that makes him dangerous beyond his control, thus presenting a risk or threat of harm to others. See *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997); *People v. Swanson*, 335 Ill. App. 3d 117, 122-23 (2002); *In re Detention of Hayes*, 321 Ill. App. 3d 178, 187-88 (2001). The previous violent acts and pattern of behavior merely serve as evidence of both the mental abnormality and an important indicator of future dangerousness. 725 ILCS 207/5(b), (f) (West 2010); *Hendricks*, 521 U.S. at 358, 362; *Stanbridge*, 2012 IL 112337, ¶ 85; see also *In re Commitment of Derry*, 393 Ill. App. 3d 482, 485 (2009) (an SVP is not committed for past conduct). If conditional release by definition means a respondent is *not* substantially probable to engage in acts of sexual violence outside the confines of an institution, then the converse means revocation of that release is required where his reoffense is *substantially probable*. See 725 ILCS 207/55(a), 60(c) (West 2010); see also 725 ILCS 207/55(a), 60(c), (d) (West 2012); *cf. In re Ottinger*, 333 Ill. App. 3d 114, 120-21 (2002) (under section 60(c) of the Act, a trial court may grant a full hearing on an application for conditional release when it is not substantially probable respondent will engage in acts of sexual violence if released). Additionally, we note the plain language of section 40 is in the present tense, so that we must examine whether the safety of others "requires" conditional release to be revoked based on present danger (as opposed to past). We believe to read the statute otherwise would lead to absurd results. See *Lieberman*, 201 Ill. 2d at 309 (in construing a statute, we must presume the legislature did not intend absurd results).

¶ 31    Based on the foregoing, our review of the case law together with the entire statutory scheme demonstrates that the risk of reoffense and, thus, the threat to the safety of others presents itself when the respondent's mental illness is not effectively treated. See *Ottinger*, 333 Ill. App. 3d at 121-22; see also *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 599 (2007) (noting, "[t]he Constitution's safeguards of human liberty in the area of mental illness and the law are not best enforced through precise, bright-line rules" (internal quotation marks omitted)); *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 976 (2006) (noting that "an individual's treatment is relevant to the decision as to whether that person is fit to be conditionally released"). Thus, the inquiry in a revocation proceeding relating to the "safety of others" may specifically focus on the respondent's progress, or regression, in treatment. Indeed, the entire purpose of the SVP law anticipates and aims to prevent sexual dangerousness stemming from mental illness, so it would make little sense to tie "safety of others" to overt acts of sexual violence. This conclusion is consistent with that of our sister state, Wisconsin, which has a nearly identical provision in its SVP statute; in interpreting "safety of others" in the context of conditional release, the Wisconsin Supreme Court has held that a trial court need not wait until "overtly dangerous acts have been committed" or ignore indications that certain rule violations can themselves represent a risk to the community. *In re Commitment of Burris*, 2004 WI 91, ¶¶ 72-74, 273 Wis. 2d 294, 682 N.W.2d 812; see also *In re Detention of Hardin*, 238 Ill. 2d 33, 46 (2010) (noting the Wisconsin SVP statute is substantially similar to the Illinois SVP statute); Wis. Stat. Ann. § 980.08(8) (West 2014) (current Wisconsin statute).

¶ 32    In now reviewing the court's determination on respondent's danger to the safety of others, we observe a trial court's ruling, that the State established by clear and convincing evidence that the "safety of others" required revocation of respondent's conditional release, will not be disturbed unless it is against the manifest weight of the evidence, *i.e.*, where the opposite

conclusion is clearly the proper result. See *In re D.D.*, 196 Ill. 2d 405, 417 (2001); *Sandry*, 367 Ill. App. 3d at 978; *People v. Robin*, 312 Ill. App. 3d 710, 715 (2000). "Clear and convincing evidence is defined as the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the veracity of the proposition in question." *In re Gloria C.*, 401 Ill. App. 3d 271, 282 (2010). Notably, it is within the province of the trier of fact, not the mental health professionals, to weigh all the evidence and witness credibility. *Gloria C.*, 401 Ill. App. 3d at 282; *Robin*, 312 Ill. App. 3d at 715.

¶ 33    Here, the trial court gave all appearances of favorably crediting the testimony of both witnesses for the State–respondent's treatment provider, Meacham, and his psychological evaluator, Dr. Smith, even though their testimony was at odds regarding the main issue of whether respondent posed a present danger to the safety of others. As the facts reveal, Meacham did not explicitly testify that respondent was presently a danger to the safety of others, while Dr. Smith did. The court determined the testimony regarding respondent's unreliable self-reporting, failed polygraph exams, thwarted PPG test, lack of insight regarding his high-risk deviant fantasies, and plotting, all demonstrated that the State had established by clear and convincing evidence that respondent's continued release posed a threat to the safety of others, even though the court had already ruled there was no evident rule violation of conditional release. This is demonstrably incongruous given that the aforementioned tasks were compliance failures solely related to conditions of respondent's release. The trial court determined the State failed to prove respondent committed a conditional release rule violation, but the court then, in error, identified rule violations, particularly related to perfidy during polygraph examinations, as the basis for determining respondent posed a danger to the safety of others.

¶ 34    Thus, the determination that the State proved by clear and convincing evidence that the "safety of others" required revocation of respondent's conditional release was against the manifest weight of the evidence. Here, while the evidence indicates respondent's lack of compliance with treatment protocol and deviant sexual fantasies might have posed a threat to the public prior to February 2012 (insofar as these fantasies seemed to precede sexually violent acts), this threat apparently diminished by the time of the hearing. Meacham testified that respondent's fantasies of force had declined, he was not masturbating at all, and indicated he was making disclosures about sexual urges and resisting the urges. She testified respondent's "sexual behavior" had improved in the last year and that since June 2012, he had been "moving in the right direction." Further, Meacham believed a shift was taking place as of February 2012, some five months before the hearing. Significantly, while respondent had previously thwarted or failed his polygraph exams, just prior to the evidentiary hearing, he passed the polygraph exam. Meacham testified that Eligard could sometimes take some months to be effective, and the evidence essentially suggested that this was just such a case.

¶ 35    By contrast, Dr. Smith testified the Eligard treatments could not eliminate arousal or change respondent's cognitive therapy response to arousal, for example, by forcing him to "intervene" when aroused or recognize the risk deviant fantasies posed. But, we must return to the fact that according to Meacham, respondent was not experiencing arousal at the time of the hearing. Again, she indicated he was then in control of his fantasies and disclosing. Dr. Smith did not directly contradict Meacham's testimony, as much of his testimony and the basis for his opinion appeared to reference respondent's past conduct and behavior. See *In re Winters*, 255 Ill. App. 3d 605, 609 (1994) (the weight to be assigned an expert's opinion depends on the

factual basis for that opinion and an expert's opinion is only as valid as the reasons for it); see, *e.g.*, *In re James*, 191 Ill. App. 3d 352, 354 (1989) (the factual basis for the medical opinion for an involuntary commitment to a mental health facility must be judged by a standard similar to the clear and convincing standard).

¶ 36    While the trial court is generally entrusted to resolve contradictions in the evidence, here the only evidence was that presently respondent had improved. From an evidentiary standpoint, respondent's improved behavior and lack of arousal necessarily defeated Dr. Smith's concerns, which were seemingly based on past conduct, regarding respondent's threat to the safety of others. Notably, because Dr. Smith's opinion (and June reevaluation report) rested on respondent's self-reports and analysis of disclosures following failed polygraph examinations, as well as Meacham's assessments of respondent, it follows that we cannot simply discount evidence that respondent passed his most recent polygraph and that, per Meacham, he was improved. See *Winters*, 255 Ill. App. 3d at 609; *James*, 191 Ill. App. 3d at 354. In short, this case does not present the quantum of evidence required to clearly and convincingly demonstrate that respondent was at that time a threat to the safety of others. At most, the record shows by clear and convincing evidence that respondent still maintained struggles with disclosing at the time of the hearing and harbored misogynistic thoughts against women. However, we would note the State cannot expect that respondent should conform all thoughts to the law, but rather the State's expectation is that respondent should conform his actions to the law. The evidence here did not present a sufficient nexus to establish that respondent's deviant thoughts and mental status in treatment made his risk of reoffense while on conditional release substantially probable (or much more likely than not), such that he was a present danger to the safety of others. See 725 ILCS 207/5(f) (West 2010); *Curtner*, 2012 IL App (4th) 110820, ¶¶ 31, 37; see also *supra* ¶¶ 23, 30 (discussion of standard for revoking conditional release). While the court found respondent had taken steps in the cycle of reoffending, it was not clear from Dr. Smith's testimony or the court's findings how many more steps respondent would have to take before respondent would be more likely than not to commit a sex offense.

¶ 37    We recognize the high-stakes related to conditionally releasing an SVP, and certainly no court wants to be "the one" that condones the release of a respondent who later reoffends. But, the State must meet its burden in providing a strong evidentiary basis for revoking the release when liberty interests are clearly at stake.

¶ 38    Lastly, respondent argues that the circuit court improperly relied on Dr. Smith's mental health reevaluation. We address this issue only because it touches on the foregoing factual and legal analysis of respondent's case. Here, the trial court noted at the outset of the hearing that it had read this particular report, which also formed the basis of the State's petition to revoke respondent's conditional release. Respondent now essentially argues that the court, in reading the report, relied on evidence outside the record because the report contained graphic details of respondent's prior sex offenses not testified to at the hearing. Although respondent frames this argument as a violation of his constitutional right to due process, we think this is more appropriately considered as an evidentiary issue.

¶ 39    We observe that the Act rather explicitly provides that "all evaluations conducted pursuant to this Act *** shall be admissible at all proceedings held pursuant to this Act." 725 ILCS 207/30(c) (West 2010). Moreover, in determining whether conditional release is appropriate, a court is *required* to consider the respondent's mental disorder, mental history, and present

mental condition, all of which necessarily requires a court to review and rely on the respondent's mental health evaluations. See 725 ILCS 207/60(d) (West 2010); see also 725 ILCS 207/40(b)(2) (West 2010). Reading the statutes together, it appears perfectly appropriate for both the trial court and this court to review respondent's mental health evaluation when considering whether revocation of conditional release is warranted. Moreover, here, the State attached the reexamination report to its petition and Dr. Smith referenced the report in his testimony. Respondent in fact cited the report during cross-examination of Meacham to show respondent's improved state. Thus, respondent not only failed to object to the implicit entry of the report into evidence, thus forfeiting the issue, but seems to have positively acquiesced in the alleged error. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); see also *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) (a party cannot complain of an error to which he consented). Given the developing area of law presented by the Act, it is important that the parties fully develop arguments below for the benefit of later addressing issues on appeal.

¶ 40                                  CONCLUSION

¶ 41         Based on the foregoing, we reverse the judgment of the circuit court revoking respondent's conditional release and reinstate the previous order authorizing respondent to be on conditional release under strict monitoring. We observe that mental health treatment is not a static process, but a dynamic one. We offer no opinion regarding whether circumstances have so changed that respondent is not now eligible to be on conditional release since this cause was originally filed.

¶ 42         Reversed.